**NESENOFF & MILTENBERG, LLP**
**Diana Warshow, Esq. (Atty ID: 021582008)**
**Andrew T. Miltenberg, Esq.**
***(pro hac vice admission pending)***
**Stuart Bernstein, Esq.**
***(pro hac vice admission pending)***
**NESENOFF & MILTENBERG, LLP**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**212.736.4500**
dwarshow@nmllplaw.com
AMiltenberg@nmllplaw.com
SBernstein@nmllplaw.com
***Attorneys for Plaintiff John Doe***

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------------X
JOHN DOE,                                      :        Civil Action No.
                                               :
                    Plaintiff,                 :
                                               :
         v.                                    :
                                               :
THE COLLEGE OF NEW JERSEY,                     :
and KATHRYN FOSTER,                            :
                                               :
                    Defendants.                :
-------------------------------------------------------------X

## COMPLAINT AND JURY DEMAND

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "John Doe"), by his attorneys Nesenoff & Miltenberg, LLP, as and for his complaint against Defendants The College of New Jersey ("TCNJ" or the "College") and Kathryn Foster ("Foster") (hereinafter collectively referred to as "Defendants"), respectfully alleges as follows:

## THE NATURE OF THE ACTION

1.       This action arises out of the intentional, discriminatory, and biased actions taken by

---

[1] Plaintiff has filed a motion herewith to proceed by pseudonym.

TCNJ against Plaintiff throughout the investigation and adjudication of patently false allegations of sexual misconduct made against Plaintiff, in the College's attempt to prove that it takes a hard stance against males accused of sexual misconduct in order to ease student uproar and avoid recission of federal funding.

2.      TCNJ engaged in a sloppy and flawed investigation that was plagued by unreasonable delays and prevented Plaintiff from having an opportunity to be heard.

3.      Despite complainant and fellow student, Jane Roe[2], making inconsistent, contradictory statements throughout the investigation and the College's utter lack of corroborating evidence, the College took Roe's statements at face value as the female complainant.

4.      On information and belief, Roe brought forth the complaint for the first time after she began dating her then-current boyfriend and did not want him to know that she engaged in a consensual sexual encounter with Plaintiff.

5.      Throughout the investigation, Plaintiff's advisor advised him to remain silent and not speak to investigators.

6.      As a result, the College improperly presumed Plaintiff guilty from the outset as a male accused, and Roe's inconsistent statements were not questioned, despite a lack of evidence.

7.      Instead, the College placed the burden of proof on Plaintiff to disprove Roe's allegations.

8.      As a result of the College's biased and flawed procedures, Plaintiff was found responsible for sexual assault and sexual harassment and was sanctioned to a two-year suspension.

9.      When Plaintiff subsequently obtained a proper advisor, he requested on appeal that the College re-open the case and allow him an opportunity to be heard, given the seriousness of

---

[2] Jane Roe is a pseudonym.

the allegations.

10.     However, the College refused to allow Plaintiff to have a hearing or interview and denied his opportunity to present his side of the story on all grounds.

11.     By denying Plaintiff a proper opportunity to be heard, TCNJ violated Plaintiff's due process rights under the United States Constitution.

12.     By employing a gender-based presumption of Plaintiff's guilt, and by imposing an unreasonable sanction, Defendant displayed anti-male discriminatory bias in violation of Title IX of the Education Amendments of 1972.

13.     Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief.

## THE PARTIES

14.     Plaintiff is a natural person and a resident of New Jersey. During the events described herein, Plaintiff was enrolled as a fulltime, tuition-paying, undergraduate student at TCNJ.

15.     Defendant TCNJ is a federally funded public college located in Ewing, New Jersey, where it maintains its principal offices and place of business.

16.     Defendant Kathryn Foster is a natural person and, upon information and belief, a resident of New Jersey.  Foster is the President of TCNJ. She was responsible for implementing the policies and procedures pursuant to which the investigation against John Doe was to be carried out and for overseeing TCNJ's Title IX Coordinator, Chelsea Jacoby.

## JURISDICTION AND VENUE

17.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law

claims as to form the same case controversy under Article III of the United States Constitution.

18.     This Court has personal jurisdiction over Defendant TCNJ on the ground that it is conducting business within the State of New Jersey.

19.     This Court has personal jurisdiction over Defendant Foster on the ground that she was employed by TCNJ at all times relevant herein and personally acted within the State of New Jersey and the District of New Jersey.

20.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.     **BACKGROUND**

   A.     **The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities to Aggressively Pursue Sexual Misconduct Complaints.**

21.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

22.     The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and the DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

23.     The OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a

higher standard of proof.  (DCL at 10-11).

24.    Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

25.    On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies and advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf OCR's April 2014 at 31.

26.    In addition, OCR's April 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. Id. at 25-31.

27.    In the same month that the OCR issued its April 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at* https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.   The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

28.    To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted over five hundred investigations of colleges for the

potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited June 7, 2020).

29.      Colleges and universities, including TCNJ, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the DOJ. In response to pressure from OCR and DOJ, educational institutions, like TCNJ, have limited procedural protections afforded to males, like the Plaintiff, in sexual misconduct cases.

**B.      The 2017 Revocation of the DCL**

30.      On September 22, 2017, the OCR formally rescinded the DCL and the April, 2014 Q&A, and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Ed., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

31.      In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*."  Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. (citations omitted) (emphasis added).

32.      The 2017 Q&A suggests that the policies and procedures in place at TCNJ at all times relevant to this lawsuit—which were tailored in such a way as to comply with the DCL under

the threat of loss of federal funding—were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

33.     On information and belief, despite the sweeping changes caused by the rescission of the 2011 DCL and the implementation of the 2017 Q&A, TCNJ did not change its Title IX procedures.

**C.     The 2020 Title IX Final Rule**

34.     On May 6, 2020, the Department of Education released new Title IX regulations, which amended the Code of Federal Regulations for Nondiscrimination on the Basis of Sex in Education for Programs or Activities Receiving Federal Financial Assistance (the "2020 Title IX Final Rule") which carry the force and effect of law as of August 14, 2020.  ("US Department of Education   Releases   Final   Title   IX   Rule,"   available   at https://www2.ed.gov/about/offices/list/ocr/newsroom.html).

35.     The 2020 Title IX Final Rule replaced all previously issued OCR guidance, including the rescinded 2001 Title IX Revised Sexual Harassment Guidance.

36.     The 2020 Title IX Final Rule provides respondents with procedural rights which the Plaintiff was deprived of during his own disciplinary proceeding, including the right to a live hearing with cross-examination of all witnesses. (*See* "Summary of Major Provisions of the Department   of   Education's   Title   IX   Final   Rule,"   available   at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf).

37.     In light of the 2020 Title IX Final Rule, TCNJ updated its Title IX Policy as of August 2020, under Foster's direction and guise.

**D.     TCNJ Faces Years of Complaints for Failing to Adequately Address Claims of Sexual Misconduct Allegedly Committed by Male Students and/or Faculty.**

38.     For years, TCNJ has faced student pressure regarding its failure to adequately

address sexual misconduct complaint made against male students and faculty.

39.     The College's "rape culture" has been prominently protested since 2013, when the College's Women in Learning and Leadership[3] program began organizing campus "Slut Walks" to stand against victim blaming. *See TCNJ students hold 'Slut Walk' to protest rape culture*, NJ.com (Sept. 17, 2015).

40.     In 2015, the key speaker of the annual "Slut Walk," political analyst Zerlina Maxwell, stated that the questions surrounding sexual assault should be reframed, and people should ask "why *he* didn't stop when *she* said 'no'" and that people "should never ask *her* why she drank so much." *Id.*

41.     TCNJ's past and present Presidents have also faced scrutiny for their handling of sexual assault on campus.

42.     Indeed, under former President, Barbara Gitenstein, the College faced a federal investigation which concluded that TCNJ has failed to disclose several reports of sexual assaults in public crime statistics. *See* Kelly Heyboer, *Sexual assault on campus: TCNJ learns lessons from federal investigation*, NJ.com (May 18, 2014), available at https://www.nj.com/education/2014/05/sexual_assault_on_campus_tcnj_learns_lessons_from_federal_investigation.html.

43.     TCNJ's president, Foster, has personally come under fire for her handling of sexual assault complaints. Indeed, TCNJ students were in an uproar in discovering that Foster had intervened in a sexual assault case at her previous university and overturned the suspension of a male student accused of sexual assault. *See* Erin Vogt, *TCNJ President Accused of Mishandling Sex Assault Case in Maine*, New Jersey 101.5 (Jan. 31, 2019).

---

[3] TCNJ's Women in Learning and Leadership program is a College run, certificate-bearing program at the College.

44.     Foster was also accused of 'mishandling' a second case at her previous school, where she overturned a female student's claims on appeal. *Id.*

45.     On information and belief, the student pressure placed on TCNJ as a result of Foster's past actions has prompted TCNJ to take a hard stance against males accused of sexual assault, and to decline to properly review allegations made by female students on appeal for fear of further student backlash.

**E.     The Alleged Incident**

46.     Plaintiff matriculated to TCNJ in 2017 with an expected graduation date of May 2021.

47.     Throughout the 2017-2018 school year, Plaintiff shared a dorm room with his roommate, Witness 3.

48.     Often times, Jane Roe would visit Plaintiff's dorm room to visit Witness 3, who was her friend and ex-boyfriend from high school.

49.     Plaintiff and Roe maintained a cordial, friendly relationship throughout the beginning of the semester and did not interact outside of Roe visiting Witness 3 in the dorm room.

50.     On or around September 30, 2017, Roe, Plaintiff, and Witness 3 were spending time in Plaintiff's dorm room.

51.     At one point, Witness 3 left the dorm room and, on information and belief, left for the night to attend a party.

52.     Once Witness 3 left, Roe remained in the room with Plaintiff.

53.     At that point, Roe was on Witness 3's bed and Plaintiff was on his bed.

54.     Plaintiff and Roe engaged in conversation, and then Roe walked over to sit on Plaintiff's bed, where they continued to talk.

55.     After a few minutes, Plaintiff and Roe engaged in consensual kissing that lasted for a few minutes.

56.     Plaintiff then asked Roe if she would give Plaintiff oral sex, and Roe said yes.

57.     Plaintiff pulled his pants down, and Roe voluntarily and willingly gave Plaintiff oral sex.

58.     Afterwards, Plaintiff and Roe fell asleep in Plaintiff's bed.

59.     The next morning, when Plaintiff and Roe woke up, they engaged in consensual kissing again.

60.     Plaintiff asked Roe if she wanted to have sexual intercourse, and Roe said yes.

61.     Plaintiff and Roe then had consensual sexual intercourse.

62.     At no point did Roe indicate that she wanted Plaintiff to stop or that she was otherwise uncomfortable. Rather, Roe was an active and willing participant.

63.     Roe left Plaintiff's dorm room shortly after.

64.     Plaintiff and Roe continued to maintain a friendly relationship with each other after the encounter, speaking to each other when they saw one another on campus.

65.     Indeed, Plaintiff and Roe had a calculus class together in the Fall of 2018, and Roe would often help Plaintiff with his assignments and send him photographs of her work.

66.     Roe never indicated that she was uncomfortable being around Plaintiff and never brought up an alleged nonconsensual encounter to Plaintiff.

**F.     Roe's Allegations**

67.     About one month after her encounter with Plaintiff, Roe began a romantic relationship with Witness 1.

68.     On information and belief, Roe regretted her sexual encounter with Plaintiff and

feared that her then-current boyfriend, Witness 1, would find out that she engaged in consensual sexual intercourse with Plaintiff, so she alleged that the encounter was nonconsensual.

69.     Moreover, Roe's social media page demonstrates an unstable mental state that lends itself to her falsifying allegations.

70.     On information and belief, in the months that followed the alleged encounter, Roe also spoke with Witness 2 who prompted her to report the incident and encouraged her to label the incident as sexual assault.

71.     On September 6, 2018, Roe and Witness 2 met with the College's Title IX Coordinator, Dr. Chelsea Jacoby ("Jacoby"), to falsely report that her sexual encounter with Plaintiff was nonconsensual.

72.     Critically, Roe admitted that she did not think of the encounter as sexual assault *until she spoke with Witness 1 about her sexual encounter with Plaintiff*.

73.     Moreover, Roe admitted that Plaintiff did not force her or keep her from leaving, but alleged that she felt that there was nothing she could do to stop the situation.

74.     Following the meeting, Jacoby entered a report via the College's Advocate-Symplicity system.

75.     However, Plaintiff never received notice that there had been a complaint entered against him.

76.     On September 27, 2018, Roe called Jacoby and indicated that she wanted to close the case.

77.     Roe did not contact the College again until *three years later* and right before Plaintiff's planned graduation.

78.     On April 23, 2021, Roe emailed Jacoby and told her that she wanted to reopen her

case and file a formal complaint on April 26, 2021.

79.     Jacoby met with Roe via Zoom on April 29, 2021, to discuss options for the Alternative Resolution Program.

80.     Jacoby and Roe exchanged drafts of an Alternative Resolution Agreement until Roe approved the agreement on May 3, 2021.

81.     Roe then filed a formal complaint with the College on May 4, 2021.

82.     Despite having spoken to Roe multiple times and even drafting a resolution at Roe's request, Plaintiff was not notified of the complaint against him until May 7, 2021.

83.     Moreover, the Notice of Allegations that Plaintiff did receive via email from Jacoby on May 7, 2021, did not include the dates of the alleged violations or specifics of the alleged encounter.

84.     Rather, the Notice only stated that Plaintiff was alleged to have engaged in nonconsensual sexual intercourse with Roe around late September/early October of 2017, and that Plaintiff allegedly made sexually harassing comments to Roe during their calculus class in the spring of 2018.

85.     Given the four-year lapse of time and the lack of specifics in the Notice of Allegations, Plaintiff was unable to discern the exact allegations or day that the Notice was referring to.

86.     As a result, the lack of specifics in the notice affected Plaintiff's ability to formulate a proper defense to the charges from the outset.

87.     The Notice of Allegations also stated that the Alternative Resolution Process was being sought in Plaintiff's matter.

88.     However, the Notice did not detail the implications or impact of participating in the

Alternative Resolution Process.

89.     Although the Notice stated that "[p]articipation in [the Alternative Resolution Process] does not constitute a responsible finding of a Policy violation, it also stated that "[t]he Alternative Resolution Process allows a Respondent in a Prohibited Conduct Case to *accept responsibility for their behavior and/or potential harm*." (emphasis added).

90.     Accordingly, due to the ambiguous wording of the Notice, it was Plaintiff's understanding that participation in the Alternative Resolution Process would constitute Plaintiff accepting responsibility for the alleged violations which he did not commit, and that such an admission may be discoverable to future employers.

91.     Plaintiff subsequently retained legal representation to act as his advisor in the matter.

92.     Plaintiff met with Jacoby on May 14, 2021, and she presented him with the Alternative Resolution Agreement that had been drafted by Roe.

93.     In the Alternative Resolution Agreement, Roe wanted Plaintiff to, among other things, do 90 hours of community service and attend online classes.

94.     Plaintiff felt that this was unreasonable punishment for something that he did not do, so he declined to participate.

95.     On May 19, 2021, Roe indicated to Jacoby that she wanted to utilize the Formal Resolution Process given that Plaintiff did not want to agree to her proposed Alternative Resolution Agreement.

96.     On May 21, 2021, Caitlin Babcock ("Babcock") and Melissa Andreas ("Andreas") were assigned to be the investigator and co-investigator, respectively, in the matter.

97.    That same day, Babcock sent Plaintiff a Notice of Allegations pertaining to the Formal Grievance Process.

98.    The Notice contained the same information surrounding the allegations as the initial Notice of Allegations.

99.    At this time, Plaintiff had already graduated from the College.

100.    Not knowing whether there were going to be criminal implications arising from Roe's allegations, Plaintiff's attorney advised him to remain silent throughout the grievance process.

101.    Accordingly, Plaintiff did not meet with Babcock to discuss the allegations.

102.    Roe, however, met with Babcock to give her formal statement and contradicted herself with her own statements.

103.    By way of example, and not limitation, regarding the nonconsensual sexual intercourse claim, Roe claimed that she was traumatized by the alleged assault, *yet could not remember* critical details such as:

    a.    The date of the alleged incident;
    b.    If the alleged incident happened on the night of a specific notable campus event that she attended;
    c.    If any interaction occurred between her and Plaintiff prior to their consensual kissing;
    d.    How she got to laying down on Plaintiff's bed;
    e.    The type of clothing she and Plaintiff were wearing;
    f.    How their clothes got removed from their bodies;
    g.    If there was any foreplay or digital penetration prior to intercourse;
    h.    What the positioning of Plaintiff's hands were and if she and Plaintiff were in any positions other than Plaintiff being on top of her;
    i.    Any interactions between Plaintiff and Roe immediately after intercourse; or
    j.    Leaving Plaintiff's residence.

104.    Roe's witnesses gave more inconsistent, contradictory statements. By way of example, and not limitation:

a.    Witness 1 testified that Roe would text him during the calculus class about Plaintiff making Roe uncomfortable, yet both he and Roe failed to produce any of the alleged text messages;

b.    Witness 2 solely testified to what Roe told him months after the fact and admitted that he had no firsthand knowledge. Moreover, Witness 2 made prejudicial, conclusory statements that Roe's allegations qualified as "rape" without proper basis, and such a statement should not have been included in the report; and

c.    Witness 3 refused to provide a statement to the Investigators, despite his close involvement in the allegations according to Roe's story.

105.    Worse, on information and belief, Babcock threatened Plaintiff's friends to testify against him.

106.    Indeed, on June 29, 2021, Plaintiff received a call from one of his friends, Friend 1, stating that Babcock called her numerous times requesting that she participate as a witness in the investigation, and that if she did not participate, her diploma and transcript would be frozen.

107.    Throughout the investigation, Plaintiff's advisor continued to advise Plaintiff to not speak to the investigators in any manner.

108.    However, Plaintiff's advisor did email Babcock and state that the allegations against Plaintiff were patently false.

109.    On or around July 27, 2021, Babcock issued the Preliminary Investigation Report.

110.    The Report contained the inconsistent statements from Roe and her witnesses but did not note the inconsistencies in any manner.

111.    Moreover, the Report included a number of additions from Roe, including that her therapist allegedly *told her* that being so "kind" to Plaintiff and sharing her work with him in their calculus class was a "common reaction" to the alleged trauma she had been through.

112.    Babcock accepted these prejudicial hearsay statements as sufficient to be included in the Report and thus considered by the Hearing Administrator, despite the fact that Roe provided no evidence of her therapist's statements or diagnosis.

113.    The next day, on July 28, 2021, Plaintiff received a notice from the College stating that a third party, S.B., attempted to access the Investigation Report that was sent to Plaintiff, and charged Plaintiff with Failure of Directive/Compliance.

114.    The College filed the new complaint against Plaintiff without even attempting to contact Plaintiff to discuss possible human or technological errors that could have created the situation.

115.    Indeed, there was a technological error when Plaintiff forwarded the Investigation Report to his advisor, as his advisor accidentally sent the report to a third party who attempted to download the Report.

116.    Plaintiff contacted the College and explained the situation, however, the College refused to drop the charge.

117.    Plaintiff attempted to submit information regarding Roe's unstable mental state through, among other things, screenshots of her social media accounts.

118.    However, Jacoby refused to include information regarding Roe's mental state in the Investigation Report, stating that it "pertains to the Reporter's medical and psychological records for which the Reporter has not provided written consent to include."

119.    Accordingly, the College allowed Roe to submit hearsay statements from her therapist regarding her mental state but would not allow Plaintiff to refute the statements and submit evidence to the same.

120.    Plaintiff received an email from Babcock on September 10, 2021, informing him that his hearing was to take place September 15, 2021.

121.    However, without any explanation, the College rescheduled the hearing for one month later, on October 15, 2021.

122.    Accordingly, by the time the hearing took place, Plaintiff had already started his job at a prestigious financial institution and had long graduated.

123.    Again, pursuant to his advisor's advice, Plaintiff did not appear at the hearing.

124.    Plaintiff received an email from the College on November 5, 2021, notifying him that he had been found responsible for sexual assault and sexual harassment.

125.    The email sanctioned Plaintiff to a two-year suspension through December 22, 2023 and imposed a number of courses and educational outcomes to be completed as well.

126.    In the email, the Hearing Administrator credited the entire account of Roe, despite Roe's own admission that she could not properly recall critical details of the alleged incidents.

127.    Accordingly, the College placed the burden on Plaintiff to disprove Roe's allegations and used his silence to his detriment.

128.    Moreover, the Hearing Administrator did not consider the statements of innocence made by Plaintiff's advisor throughout the investigation, as the email stated that only the sanction range provided by the Title IX & Sexual Misconduct Staff, the Reporter's impact statement, feedback from the Reporter provided at the sanctioning phase of the hearing, as well as mitigating and aggravating circumstances were taken into account at the sanctioning phase.

129.    Despite being found responsible, the College released Plaintiff's transcript, in contradiction to their findings, demonstrating that Plaintiff was safe enough to apply to post-graduate jobs and therefore should have not been seen as a threat to campus either.

130.    Plaintiff subsequently requested an extension for his time to file an appeal given that he was working full time.

131.    However, despite the College's multiple delays throughout the investigation, Plaintiff's request was denied.

132.    Plaintiff then retained a new advisor and was advised that he should spoken during the investigation.

133.    Accordingly, given this new advice, Plaintiff's appeal not only pointed out numerous procedural flaws in the investigation and requested that the finding and sanction be overturned, but also, in the alternative, that the College re-open the case and allow Plaintiff a hearing so that he could have a proper opportunity to be heard.

134.    However, the College denied Plaintiff's appeal on all grounds on December 2, 2021, by way of letter from Appellate Officer, Crystal Maldonado, Director of Student Conduct and Off Campus Services.

135.    Plaintiff has exhausted all available avenues for appeal under TCNJ's policies. This lawsuit represents Plaintiff's only hope to redress the wrongs occasioned by Defendant.

## II.    AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRANTIES BETWEEN PLAINTIFF AND DEFENDANT TCNJ

136.    Upon Plaintiff's matriculation to TCNJ, Plaintiff and TCNJ became mutually bound by TCNJ's Interim Sexual Harassment, Misconduct, and Discrimination Policy (the "Policy"), which is the applicable policy for TCNJ's sexual misconduct procedures.

137.    On information and belief, the Policy is updated and/or revised each new school year.

138.    The Policy and/or the various provisions contained therein are available online through the TCNJ website.

139.    In response to local and federal pressure for failing to protect female accusers or take a strong stance against sexual assault against males, TCNJ applied the Policy in a manner that, on information and belief, resulted in harsher penalties for males accused of sexual

misconduct as compared to females.[4]

140.    The Policy contains and represents a contract between students and the College and, in particular, between Plaintiff John Doe and Defendant TCNJ.

141.    Throughout the disciplinary process in this case, Defendant breached its contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policy and the processes set forth therein, and by permitting gender bias to infect and taint the proceedings, resulting in an erroneous outcome.

142.    The Policy states that once a formal complaint is signed, a Respondent is to be informed, in writing, of "the identities of the parties (if known); the date and location of the alleged incident (if known); potential Policy violations; that a determination of responsibility will be made only at the conclusion of a hearing (if a hearing is applicable); and that the Respondent is presumed not responsible for the alleged Prohibited Conduct prior to the determination."

143.    The College breached the Policy by failing to provide proper notice. The Notice of Allegations did not include the dates of the alleged violations or the specifics of the alleged encounter, thus precluding Plaintiff's ability to properly formulate a defense from the start.

144.    According to the Policy, "[t]he burden of proof (preponderance of the evidence), and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest on the College and not on the individual parties."

145.    The College breached the Policy by improperly placing the burden of proof on Plaintiff to disprove Roe's allegations. Despite Roe's complete lack of consistent statements and lack of evidence, the College still credited Roe's entire statement given that Plaintiff did not give

---

[4] TCNJ has not published statistics concerning the outcomes of sexual misconduct proceedings, including the gender of respondents who were sanctioned as a result thereof. This is information that Plaintiff intends to seek in discovery.

a statement.

146.    Moreover, the Policy states that "the Hearing Administrator cannot draw any inferences about the determination regarding responsibility based solely on a party's or witness' absence from the live hearing or refusal to answer cross-examination or other questions."

147.    The College breached this Policy because Plaintiff was found responsible due to his absence from the hearing and the fact that he did not give a statement during the investigation or at the hearing, given the lack of evidence upon which to find Plaintiff responsible.

148.    According to the Policy, "[t]he Formal Grievance process will be concluded within a reasonably prompt manner, and the College will make every effort to not exceed ninety (90) business days after the filing of the Formal Complaint, provided that the process may be extended for a good reason, including but not limited to the absence of a party, a party's Advisor, or a witness; concurrent law enforcement activity; or the need for language assistance or accommodation of disabilities. Should the Reporter or Respondent need a reasonable extension, without undue delay, a written request must be submitted to the Investigator(s) for consideration."

149.    The College breached the Policy by exceeding the 90 business days without reason. Indeed, Plaintiff was notified of the Formal Grievance Process on May 21, 2021, and the hearing did not occur until October 15, 2021, well exceeding the allotted 90-day timeframe in the Policy. the College provided no explanation for the delay.

150.    The Policy states that it applies to "Students, employees (including faculty and staff), Third Parties, and any individuals participating in—or attempting to participate in—the College's Education Program or Activities or seeking admission or employment to the College."

151.    The Policy also states that the College may dismiss a Formal Complaint if "the Respondent is no longer enrolled or employed by the College."

152.     The College breached the Policy because the College did not have jurisdiction over the complaint. By the time Plaintiff was notified of the Formal Grievance Process, Plaintiff had already graduated from the College and therefore was no longer a student. Plaintiff was starting his job outside of TCNJ and was no longer enrolled at TCNJ and was not participating or attempting to participate in the College's Education Program or Activities. Thus, by the time the Formal Grievance process began, the College had no jurisdiction over Plaintiff, and the Formal Complaint should have been dismissed in its entirety.

## III.   **PLAINTIFF'S DAMAGES**

153.     As a direct and proximate result of Defendant's biased, illegal, and improper conduct, an erroneous finding that Plaintiff engaged in sexual assault and sexual harassment has been made a part of Plaintiff's educational records and a notation has been made on his transcript. These records may be released to educational institutions and employers to whom Plaintiff applies, substantially limiting his ability to gain acceptance to another school or to secure future employment. Roe's allegations painted Plaintiff as a dangerous sex criminal, wiping out a lifetime of hard work towards his college education and future career prospects.

154.     By improperly suspending Plaintiff and placing a notation on his transcript, TCNJ has damaged Plaintiff's future education and career prospects. Specifically, as a result of TCNJ's actions, Plaintiff will be forced to disclose and explain to potential employers and any undergraduate or graduate school to which he may opt to apply that he was disciplined by TCNJ for sexual misconduct.

155.     Due to Defendant's biased, illegal, and improper conduct, Plaintiff was subjected to an unfair, biased, improper investigation and adjudication process which destroyed his reputation and will permanently impact his future education and career prospects.

156.    Due to Defendant's biased, illegal, and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

157.    Due to Defendant's biased, illegal, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual misconduct.

158.    Due to Defendant's biased, illegal, and improper conduct, Plaintiff's academic file is now marred by a false and baseless finding of sexual misconduct, and the Sanction is listed on Plaintiff's transcript.

159.    Due to Defendant's biased, illegal, and improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, economic losses, and damages to his future educational and career prospects.

## AS AND FOR A FIRST CAUSE OF ACTION
### 42 U.S.C. §1983: Denial of Fourteenth Amendment Due Process
### (Against Defendant Foster)

160.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

161.    Upon information and belief, Defendant Foster is the TCNJ official charged with ensuring that student education records, including transcripts, are disclosed to third-party requesters.

162.    Upon information and belief, Foster is also the TCNJ official responsible for the conferral of degrees to TCNJ students.

163.    Foster was responsible for implementing the policies and procedures as issue in Plaintiff's case.

164.    Foster was responsible for implementing and maintaining the Office of Title IX and Sexual Misconduct, including the Title IX Coordinator, Jacoby, and overseeing her work in

ensuring TCNJ's compliance with Title IX and other applicable laws. Jacoby reported to Foster, and, on information and belief, provided her with statistics on sanctions issued for sexual misconduct violations at TCNJ.

165.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." A similar right is stated in the Fifth Amendment to the United States Constitution.

166.   Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

167.   A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and educational liberty, of which he cannot be deprived without due process.

168.   Plaintiff's constitutionally protected property interest in his continued enrollment at TCNJ and to be free from arbitrary suspension and dismissal arises from the policies, courses of conduct, practices and understandings established by TCNJ.

169.   Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between TCNJ and Plaintiff.

170.   It is well established that Fourteenth Amendment due process protections are required in higher education disciplinary proceeding.

171.   TCNJ is a state college with its principal administration offices in Ewing, New Jersey.

172.    Plaintiff had obeyed all institutional rules when he was wrongly suspended from TCNJ.

173.    Plaintiff was entitled to a process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. Plaintiff was deprived of a fundamentally fair process.

174.    Plaintiff's right to due process was violated when the College refused to reopen the case to provide Plaintiff a fair opportunity to be heard once he obtained new and proper advisors.

175.    Throughout the investigation, Plaintiff's then-advisor advised him to not speak to the Investigator, and accordingly, Plaintiff did not have the opportunity to be heard at the time.

176.    However, upon receiving proper counsel, Plaintiff requested that the College reopen the case and allow him an opportunity to be heard before being found responsible.

177.    Given the seriousness of the allegations and the consequences of the finding of responsibility, the College should have afforded Plaintiff a fair opportunity to be heard.

178.    By denying Plaintiff the opportunity to give a statement or have a hearing once he obtained proper counsel, TCNJ violated Plaintiff's due process rights.

179.    TCNJ failed to provide Plaintiff with the basic due process protections that it was required to provide students accused of sexual misconduct at a state college.

180.    TCNJ, Foster, as well as other agents, representatives and employees of TCNJ intentionally, willfully, wantonly, oppressively and maliciously violated Plaintiff's due process rights.

181.    TCNJ deprived Plaintiff of the requisite due process because the College has a pecuniary interest in the outcome of the adjudication. Specifically, TCNJ was under immense pressure given Foster's past actions in reversing findings of sexual misconduct, and given the

ongoing OCR investigations into noncompliant universities, risked the loss of federal funding or other penalty if they found in favor of Plaintiff.

182.    Based on the foregoing, TCNJ violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of Jane Roe's allegations.

183.    As a result of the foregoing, Plaintiff is entitled to prospective injunctive relief expunging Plaintiff's disciplinary record; removing any record of Plaintiff's suspension from his education file; and destroying any and all records pertaining to Jane Roe's complaint.

### AS AND FOR A SECOND CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972
### (Against TCNJ)

184.    Plaintiff John Doe repeats and re-alleges each and every allegation above as if fully set forth herein.

185.    Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

186.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant TCNJ.

187.    On information and belief, TCNJ receives federal funding, including in the form of federal student loans given to students and is subject to the provisions of Title IX.

188.    Title IX is enforceable through a private right of action.

189.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures

providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

190.   Title IX may be violated by a school's imposition of university discipline where gender is a motivating factor in the decision to discipline.

191.   TCNJ engaged in gender bias in its disciplinary proceedings. Plaintiff was innocent and wrongly found to have committed a violation of TCNJ's policies, and gender bias was a motivating factor.

192.   TCNJ failed to conduct an adequate, reliable, and impartial investigation of Roe's complaint because, by way of example, and not limitation:

a.   Failing to provide Plaintiff with proper notice of the allegations against him;
b.   Attempting to charge Plaintiff with a Failure of Directive charge, demonstrating the College's presumption of guilt;
c.   Failing to ask Roe questions that would negatively impact her credibility and inquire as to inconsistencies in her statement;
d.   Failing to take statements of innocent from Plaintiff's advisor into account in rendering the decision;
e.   Failing to properly apply the preponderance of the evidence standard; and
f.   Refusing to afford Plaintiff an opportunity to be heard once Plaintiff obtained a proper advisor.

193.   Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous findings and the decision to impose unduly harsh discipline upon Plaintiff. These circumstances include, by way of example, and not limitation:

a.   The pressure imposed by ongoing OCR investigations, including the fear of loss of federal funds as well as the fear of added financial liability such as reimbursing tuition for aggrieved students if the College was not compliant;
b.   Internal pressure from the student body and/or media to aggressively pursue complaints of sexual misconduct against males and to believe all women in cases of sexual assault regardless of the evidence;
c.   Defendant's refusal to allow Plaintiff to submit evidence pertaining to Roe's mental state after allowing Roe to submit evidence of the same;
d.   Defendant's distortion of the evidence and Plaintiff's statements to fit Roe's

narrative, rather than impartially evaluating the facts of the case; and

e.   Pressure imposed upon Foster based upon her previously reversing a male student's sanctions.

194.   On information and belief, TCNJ's mishandling of the complaint was informed by institutional pressure, ongoing OCR investigations into noncompliant universities, and the threat of rescission of federal funds.

195.   On information and belief, TCNJ has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against non-male students.

196.   Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

197.   This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

198.   As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing TCNJ to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original finding and sanction from Plaintiff's educational file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against

Defendant as follows:

(i) on the first cause of action for violation of constitutional due process under 42 U.S.C. § 1983, an injunction directing Foster to (i) expunge Plaintiff's disciplinary record; (ii) remove any record of Plaintiff's suspension from his education file; and (iii) permanently destroy any record of Jane Roe's complaint;

(ii) On the second cause of action for Violation of Title IX of the Education Amendments of 1972 Erroneous Outcome, a judgment against TCNJ awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing TCNJ to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

(iii) Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

**Dated:** **New York, New York**
   **May 31, 2022**

        **Respectfully submitted,**

        **Nesenoff & Miltenberg, LLP**
        ***Attorneys for Plaintiff John Doe***

        By: /s/Diana R. Warshow
         Diana R. Warshow, Esq.
         Andrew Miltenberg, Esq.
         Stuart Bernstein, Esq.
         363 Seventh Avenue, 5th Floor
         New York, New York 10001
         212-736-4500 (telephone)
         212-736-2260 (fax)
         amiltenberg@nmllplaw.com
         sbernstein@nmllplaw.com
         dwarshow@nmllplaw.com